**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**GREAT FALLS DIVISION**

| | |
|---|---|
| FORT BELKNAP INDIAN COMMUNITY OF THE FORT BELKNAP RESERVATION OF MONTANA, a federally recognized Indian Tribal Entity,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>Defendants. | **CV-25-111-BMM**<br><br>**ORDER ON MOTIONS TO DISMISS** |

## INTRODUCTION

The Fort Belknap Indian Community of the Fort Belknap Reservation of Montana ("FBIC"), a federally recognized Indian Tribe, sued the United States Department of Interior ("Defendants"). (Doc. 1.) FBIC alleges that Defendants failed to comply with the Congressional mandate to establish terms and conditions ("Terms and Conditions") by which shares of the natural flow of the Milk River Basin in the United States are allocated between FBIC and the Blackfeet Tribe ("Blackfeet"). (*Id.* ¶ 1.) FBIC alleges that this action "arises out of [Defendants']

violation of: (1) its treaty and trust responsibilities guaranteeing the FBIC's federally reserved, Indian water rights in the Milk River Basin." (*Id.* ¶ 2.)

**Procedural Background**

Defendants filed their original motion to dismiss on May 28, 2026. (Doc. 19.) Blackfeet motioned to intervene that same day for the limited purpose of moving to dismiss this action under FRCP 12(b)(7) and FRCP 19. (Doc. 22.) The Court granted Blackfeet's intervention as of right on the basis that Blackfeet has a legally protected interest in its Milk River water rights potentially affected by FBIC's action. (Doc. 37 at 10.) Blackfeet filed its own motion to dismiss. (Doc. 38.)

FBIC filed its first amended complaint ("FAC") on July 15, 2026. (Doc. 50.) Defendants and Blackfeet separately filed motions to dismiss the FAC. (Docs. 53 and 55.) FBIC first alleges that Defendants failed to comply with § 3723 of the Blackfeet Water Rights Settlement Act, Pub. L. No. 114-322, 130 Stat. 1627, 1814-56 ("Settlement Act"). (Doc. 50 at 27.) FBIC voluntarily dismissed Claim 1 in its reply. (Doc. 67 at 10-11.) FBIC next alleges that Defendants failed to provide for the exercise of FBIC's quantified Milk River Indian water rights and thereby violated Defendants' treaty, statutory and common law trust duties. (*Id.* at 28.) FBIC finally alleges that Defendants violated § 706 of the Administrative Procedure Act, 5 U.S.C. § 701-706 ("APA"). (*Id.* at 31.) The Court held a hearing on the matter on October 6, 2026. (Doc. 75.)

## FACTUAL BACKGROUND

FBIC is a federally recognized sovereign Indian tribe located within the District of Montana. (Doc. 1 ¶¶ 6, 8.) The Fort Belknap Reservation is the homeland of the Gros Ventre (Aaniiih) and Assiniboine (Nakoda) Tribes. (*Id.* ¶ 8.) The Fort Belknap Indian Community Council governs FBIC. (*Id.* ¶ 7.) The Blackfeet Tribe of the Blackfeet Indian Reservation also is a federally recognized sovereign Indian tribe located within the modern-day boundaries of the State of Montana. Tribal water rights attach at a tribe's priority date. FBIC and Blackfeet share an equal priority date of October 17, 1855, and each separately have negotiated their Milk River water rights with the United States and the State of Montana. (Doc. 54 at 10.)

### A. Historical Context

FBIC's current claim arises from a long history of treaties and water rights litigation. The 1851 Treaty of Fort Laramie represents the first treaty with Indian tribes in what would become Montana. The 1851 Treaty described the respective territories of the Blackfeet and Assiniboine Nations. (Doc. 50 at 10.) The Piegan, Blood, and Blackfeet bands of the Blackfoot Nation signed another treaty in 1855. (Doc. 38 at 13.) The Gros Ventre Tribe signed the 1855 Treaty as part of the Blackfoot Nation. (*Id.*) The 1855 Treaty with the Blackfoot restricted the 1851 territories to areas of the tribes' exclusive control for the purpose of establishing an agrarian homeland. (Doc. 50 at 10.)

Separate agreements between FBIC, Blackfeet, and the United States established the present FBIC and Blackfeet reservations. (Doc. 38 at 13.) Congress approved the separate agreements on May 1, 1888. (*Id.*) (citing 25 Stat. 113, chapter 212 and 213.) FBIC and Blackfeet have occupied their respective reservations since the 1888 establishment date. (Doc. 38 at 14.) An 1895 agreement further narrowed FBIC's territory and promised certain agricultural implements in exchange. Agreement with the Indians of Fort Belknap Indian Reservation in Montana, ch. 398, 29 Stat. 350 (1895) ("Grinnell Agreement").

The tension between FBIC's arid territory and the agricultural purpose of the reservation inevitably led to water disputes. *Winters v. United States*, 297 U.S. 564 (1908), considered whether the creation of the Fort Belknap Indian Reservation included reserved water rights. *Winters* recognized that the 1888 treaty had intended for FBIC to become a "pastoral and civilized" people. *Winters*, 207 U.S. at 576. The U.S. Supreme Court reasoned that irrigation would be essential to that purpose due to FBIC's arid territory. *Id. Winters* now stands for the general proposition that Indian tribes with agricultural purposes reserved water rights at the time of the reservation's creation. *See Id.* at 575-76; *See also Arizona v. Navajo Nation*, 599 U.S. 555, 563 (2023). *Winters* guaranteed FBIC a Milk River water right of at least 125 cubic feet per second (cfs) but did not quantify the entirety of FBIC's Milk River water right. *Id.* at 565.

The Fort Belknap Indian Irrigation Project – Milk River Unit ("FBIIP") was created under *Winters* authority. (Doc. 50 at 8-9.) FBIIP provided the funding for infrastructure to irrigate 10,425 acres with the adjudicated *Winters* 125 cfs water right. (*Id*. at 9.) Congress first authorized construction and funding for the FBIIP in 1898. (Doc. 1 at 11.) FBIIP began receiving its appropriated funds in 1908. (Doc. 67 at 21 n. 6.)

**B. The Compacts**

Tribes often negotiate their water rights with the state surrounding their reservation land and memorialize their agreements in a compact. Congress must ratify those compacts for them to take federal effect. Both Blackfeet and FBIC have negotiated compacts regarding their Milk River water rights with the State of Montana. FBIC negotiated its compact with the State of Montana and the United States in 2001. The State of Montana ratified the compact. Mont. Code Ann. § 85-20-1001. (Doc. 67 at 21.) The compact allocated FBIC 645 cfs, which includes the 125 cfs guaranteed in *Winters*. (*Id.*) The 125 cfs guaranteed in *Winters* currently irrigates the FBIIP. (*Id.*) The compact would designate an additional 520 cfs to irrigate 19,930 acres of future practically irrigable acreage on FBIC's reservation. (*Id.*) (citing MCA § 85-20-1001.) The additional 520 cfs remains unallocated federally due to the failure of Congress to ratify FBIC's compact. (Doc. 38 at 17.)

Blackfeet's compact is the Settlement Act. The Montana Legislature ratified

the Blackfeet Compact through the Settlement Act in 2009. (*Id.* at 15) (citing Mont. Code Ann. § 85-20-1502 *et seq*.) Congress ratified the Settlement Act in 2016. Pub. L. No. 114-322, 1230 Stat. 1627. Blackfeet's membership approved the Settlement Act in 2017. (Doc. 38 at 15-16.) The Settlement Act defines Blackfeet's right in the Milk River as "all Natural Flow available to the United States under the Boundary Waters Treaty and All Ground Water not subject to the Boundary Waters Treaty in Basin 40F within the [Blackfeet] Reservation, with the exception of those waters subject to Waters Rights Arising Under State in Basin 40F on the [Blackfeet] Reservation." (*Id.* at 16-17).

**C. The Terms and Conditions**

The Settlement Act purports to address the separate interests of FBIC and Blackfeet in the Milk River. Section 3705(e) of the Settlement Act requires FBIC and Blackfeet to enter an agreement to provide for the exercise of their respective water rights in the Milk River. The Settlement Act directed FBIC and Blackfeet to reach agreement within three years after the Secretary of Interior certified, under § 3705(f)(5), that Blackfeet's membership had approved the Blackfeet Compact. Pub. L. No. 114-332, 130 Stat. 1628, 1818 (Dec. 16, 2016). The Secretary of Interior certified Blackfeet's approval on May 30, 2017. (Doc. 50-1 at 2.) The certification date set May 30, 2020, as the deadline for FBIC and Blackfeet to reach an agreement. (Id.) FBIC and Blackfeet failed to reach agreement. (*Id.*)

The Settlement Act anticipated that FBIC and Blackfeet might fail to reach an agreement and provided a procedure: The Secretary of Interior, in her sole discretion, must establish terms and conditions by which the respective water rights of FBIC and Blackfeet in the Milk River may be exercised. Pub. L. No. 114-322, § 3705(e), 130 Stat. at 1818. The terms and conditions must reflect three considerations listed in § 3705(c)(2): (1) the equal priority dates of Blackfeet and FBIC; (2) the water supplies of the Milk River; and (3) historical, current, and future uses of Blackfeet and FBIC. *Id.* §§ 3795(e) and 3705(c)(2), 130 Stat. at 1818. The Settlement Act directs the Secretary of Interior to consult with FBIC and Blackfeet before issuing the terms and conditions. (Doc. 50-1 at 2.)

The Secretary of Interior began consultation with FBIC and Blackfeet on what would become the Terms and Conditions in 2023. (*Id.*) The Secretary of Interior shared a draft of the Terms and Conditions with FBIC and Blackfeet on April 2, 2024. (*Id.*) The final Terms and Conditions issued on December 19, 2024. (*Id.*) The Terms and Conditions represent final agency action for APA purposes and allow a one-year period for judicial review. Pub. L. No. 114-322, § 3705(e)(2)-(3), 130 Stat. at 1818.

The Terms and Conditions recognize that the Milk River's natural flow may not be sufficient to satisfy both FBIC's and Blackfeet's fully developed water rights. (Doc. 50-1 at 4.) The Terms and Conditions direct FBIC and Blackfeet to measure

their own respective diversions and meet annually no later than March 1 of each year to coordinate projected respective water demands and anticipated water supply. (*Id.* at 7.) The Terms and Conditions permit the Bureau of Reclamation to implement shortage sharing measures for those years that the Bureau of Reclamation designates a shortage in the natural flow. (*Id.* at 7.)

## LEGAL STANDARD

**Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6).**

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint under this pleading standard. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal proves appropriate where the complaint fails to state a claim upon which relief can be granted. *Mendiondo v. Centinela Hospital Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). A court may dismiss a complaint "based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

A complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face to survive a Rule 12(b)(6) motion. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). A claim proves plausible on its face when "the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The plausibility standard does not require probability, but "asks for more than sheer possibility that defendant has acted unlawfully." *Id.* A court must "take[] as true and construe[] in the light most favorable to plaintiffs" all factual allegations set forth in the complaint. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (internal quotation marks omitted).

**Motions to Dismiss Under Fed. R. Civ. P. 12(b)(7) and 19.**

A required party must be joined to a suit where feasible if either the court cannot accord complete relief among existing parties in that party's absence, or the party claims an interest relating to the subject of the action and is so situated that disposing of the action in their absence would impair or impede their ability to protect their interest. Fed. R. Civ. P. 19(a)(1); *Dine Citizens Against Ruining Our Env't v. BIA*, 932 F.3d 843, 851 (9th Cir. 2019). A court must determine, in equity and good conscience, whether the action should proceed or be dismissed if the required party cannot be joined. Fed. R. Civ. P 19(b). Parties may motion to dismiss under Fed. R. Civ. P. 12(b)(7) if the case cannot proceed without the unjoined party. A "wall of circuit authority" requires dismissal when an Indian tribe cannot be joined due to its assertion of tribal sovereign immunity. *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, 48 F.4th 934, 947 (9th Cir. 2022) (citations omitted);

*Maverick Gaming, LLC v. United States*, 123 F.4th 960, 971 (9th Cir. 2024).

## DISCUSSION

Defendants contend that FBIC has not alleged any substantive source of law establishing a specific fiduciary duty that Defendants failed to perform. (Doc. 54 at 15.) FBIC's APA claim, according to Defendants, requires establishing the same fiduciary duty and lacks merit under the same analysis. (*Id.* at 21.) Blackfeet argues that it qualifies as a required party in FBIC's action. (Doc. 56 at 6.) Blackfeet reasons that the suit must be dismissed, because Blackfeet has not waived its sovereign immunity and cannot be joined. (*Id.* at 9.) The suit, according to Blackfeet, cannot proceed in equity and good conscience without Blackfeet. (*Id.* at 13.) The Court addresses Defendants' and Blackfeet's arguments in turn.

### I. Whether FBIC Can Establish a Cognizable Breach of Trust.

The United States exercises a "distinctive obligation of trust" in dealing with Indian tribes. *United States v. Mitchell* (*Mitchell II*), 463 U.S. 206, 225 (1983) (quoting *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942)). The trust obligation is a "moral" one of the "highest responsibility[.]" *Seminole Nation*, 316 U.S. at 297. This obligation alone does not require action beyond complying with generally applicable statutes and regulations. *Shoshone-Bannock Tribes v. Reno*, 312 U.S. App. D.C. 406, 56 F.3d 1476, 1482 (D.C. Cir. 1995); *Gros Ventre Tribe v. United States*, 469 F.3d 801, 810 (9th Cir. 2006.)

The United States owes judicially enforceable duties to a tribe when it "expressly accepts those responsibilities." *United States v. Jicarilla Apache Nation*, 564 U. S. 162, 177 (2011). The United States accepts an enforceable obligation where a treaty, statute, or regulation imposes certain duties on the United States. *See Arizona v. Navajo Nation*, 599 U.S. 555, 563-564 (2023); *Jicarilla*, 564 at 173-174. A court's analysis "must train on specific rights-creating or duty-imposing" language in the treaty, statute, or regulation in question. *Navajo Nation*, 537 U. S., at 506; *Arizona*, 599 U.S. at 564.

**A. Sources of Federal Obligations.**

FBIC points to several potential legal sources of federal obligations to argue that Defendants failed to perform a specific fiduciary duty. (Doc. 67 at 12-15.) FBIC argues that these potential sources can be read in conjunction to create a trust duty under *Rosebud Sioux Tribe v. United States*, 9 F.4th 1018, 1023 (8th Cir. 2021). The Court need not consider yet what composite authority the potential sources create, however, because the Court finds that the Settlement Act imposes sufficient obligation to overcome a motion to dismiss.

The Court declines to review these potential sources pursuant to the Indian Canons of Construction as the suit concerns two separate tribes with competing legal interests. The Indian Canons of Construction apply to ensure that the language of treaties cannot be construed to the "prejudice" of the tribal nations that negotiated

them. *Worcester v. Georgia*, 31 U.S. 515, 582 (1832). The Indian Canons of Construction require courts to construe liberally treaties, statutes and executive orders in favor of establishing Indian rights. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 767 (1985). The Ninth Circuit consistently has rejected the use of the Indian Canons of Construction, however, in cases involving the countervailing interests of other tribes where the government owes the same trust duty to all the implicated tribes. *Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334, 340 (9th Cir. 1996) (quoting *Nance v. EPA*, 645 F.2d 701, 711 (9th Cir. 1981)). Defendants owe Blackfeet and FBIC identical obligations regarding their Milk River water rights. (Doc. 54 at 10.)

FBIC's arguments regarding the 1855 Treaty, the 1888 Agreements, and the Grinnell Agreement prove substantially similar. FBIC contends that the discussion of exchanges of land and funds for FBIC's "agricultural and mechanical pursuits" in these agreements guaranteed FBIC certain irrigation rights. (*See* Doc. 67 at 12-14.) The Court remains unconvinced that these assertions provide more support than simply reaffirming FBIC's existing reserved water right established in *Winters*. These sources do not detail the contours of Defendants' alleged obligations and provide no specific statutory duty that the Court can enforce. *Jicarilla*, 564 U.S. at 177.

*Winters* alone creates no trust obligation and does not bar this litigation by res

judicata. (Doc. 67 at 23.) Defendants in no way contend that FBIC lacks *Winters* rights. (Doc. 68 at 3.) Defendants acknowledge FBIC's implied reservation and vesting of water rights. (*Id.*) *Winters* does not prove sufficient alone, however, to create a judicially enforceable obligation. The U.S. Supreme Court squarely has rejected the contention that *Winters* requires the federal government to take affirmative steps to assess or secure tribal water rights. *Arizona*, 599 U.S. at 569-70. FBIC's requested relief would void the Secretary of Interior's Terms and Conditions and compel the adoption of modified Terms and Conditions. FBIC's modified Terms and Conditions certainly would require assessment to secure FBIC's water rights.

FBIC turns next to its unratified water rights compact. (Doc. 67 at 21.) FBIC unfortunately cannot contend at this point that the federal government has "expressly accepted" any of the obligations the compact imposes. *Arizona*, 599 at 564. The Court acknowledges that Congress has yet to ratify the compact and cannot plausibly find express acceptance of any duty in an unratified compact.

FBIC finally contends that the Settlement Act created a trust obligation where it required the Secretary of Interior to establish terms and conditions by which each tribe would exercise its reserved water rights in the Milk River. (Doc. 67 at 21.) Section 3705(e)(1) created further obligations by requiring that those terms and conditions reflect the "historical, current, and future uses" identified by FBIC and Blackfeet. (*Id.*) The Court finds that this language proves sufficient to impose duties

on Defendants.

The D.C. Court of Appeals reviewed a similar compact in *Hill v. United States DOI*, 151 F.4th 420, 431-432 (D.C. 2025). *Hill* concerned the compact negotiated between the Crow (Apsáalooké) Tribe, the State of Montana, and the United States. *Hill*, 151 F.3d at 425. The Crow Tribe Water Rights Settlement Act, Pub. L. No. 111-291, 124 Stat. 3097 ("the Crow Settlement Act") imposed several discrete responsibilities on the United States. *Hill* found duty-creating obligations where the compact included trust creating language and identified the Crow Tribe as a beneficiary. *Id*. The Crow Settlement Act directed, *inter alia*, the Secretary of Interior to confirm that seven specific conditions had been satisfied and then publish those findings in the Federal Register. *Id.* at 431-432. *Hill* found that duty satisfied when the Secretary of Interior appropriately published those findings. *Id.* at 432.

The Settlement Act, like the Crow Settlement Act, imposes an obligation on the Secretary of Interior, and specifies FBIC and Blackfeet as beneficiaries of that obligation. Section 3705(e) requires the Secretary of Interior to craft the Terms and Conditions for exercise of FBIC's and Blackfeet's water rights in the Milk River. Section 3705(e)(1) imposes more specific obligations by requiring that the Terms and Conditions reflect the "historical, current, and future uses" identified by both FBIC and Blackfeet. This language clearly imposes the contours of the Secretary of Interior's duties to FBIC and Blackfeet and delineates a clear path toward resolution.

*Jicarilla*, 564 U.S. at 177. The Court finds that FBIC has demonstrated sufficiently that the Settlement Act may impose a trust obligation to overcome a motion to dismiss.

**B. Breach of Trust.**

The Court next must consider whether FBIC can demonstrate evidence that Defendants have breached their duties under the Settlement Act. FBIC has demonstrated that Defendants may have a trust obligation to establish the Terms and Conditions for the allocation of the Milk River between FBIC and Blackfeet. The Secretary of Interior remains obligated to consider the factors listed in § 3705(c) when crafting the Terms and Conditions. Defendants would breach these duties by failing to perform them as required by the Settlement Act. FBIC argues that the Secretary of Interior breached those duties by failing to consider that FBIC has more historical and currently irrigated lands than Blackfeet, and that future FBIIP expansions would increase FBIC's irrigable acreage. (Doc. 50 at 22-27.)

Section 2 of the Terms and Conditions acknowledges the § 3705(c) factors. FBIC and Blackfeet identified their historic, current, and future uses during consultation and ongoing communication. (Doc. 50-1 at 4). FBIC historically has made larger use of Milk River water than Blackfeet. (*Id.* at 5.) FBIC plans to expand that usage. (*Id.*) The Terms and Conditions state that Section 4, which details the actual terms and conditions of use, reflect these considerations.

Whether the Terms and Conditions adequately reflect these considerations presents a question of fact. Section 4(f) apportions the Milk River between Blackfeet and FBIC. (*Id.* at 6.) Blackfeet shall have a right to the United States share of the natural flow of the Milk River as calculated by § 4(d) of the Terms and Conditions. (*Id.*) FBIC's guarantee appears much less definite. FBIC's *Winters* right to 125 cfs is recognized. (*Id.* at 6-7). FBIC will receive up to 645 cfs, if Congress ratifies FBIC's compact. (*Id.* at 7.) Section 4(g) of the Terms and Conditions relegates any other considerations to an annual meeting for FBIC and Blackfeet to discuss their allocations, and the Bureau of Reclamation's ability to implement shortage sharing measures. (*Id.*) None of these provisions seem to allocate the Milk River between FBIC and Blackfeet with any certainty, let alone explicitly reflect consideration of FBIC's acknowledged historic, current, and future higher usage of Milk River water. FBIC has demonstrated sufficient evidence of breach to overcome a motion to dismiss.

**C. APA Review.**

FBIC claims that Defendants arbitrarily, irrationally and in excess of statutory authority failed to provide for FBIC's exercise of its reserved water rights. (Doc. 50 at 31.) FBIC alleges that Defendants violated APA § 701 *et seq.* in failing to consider in the Terms and Conditions the equal priority dates of FBIC and Blackfeet, the available water supplies of the Milk River, and the historical, current and present

uses identified by FBIC as required by § 3705(e)(1). (*Id.* at 32.) The Settlement Act designates the Terms and Conditions' final agency action subject to judicial review. (*Id.*)

Defendants' sole argument in opposition to FBIC's APA claim is that FBIC has brought the claim under the same breach of trust allegations as Count Two. (Doc. 64 at 27.) The Defendants' argument fails. The Court previously determined that Count Two has merit and proves sufficient to overcome a motion to dismiss.

A "strong presumption" exists that Congress intends judicial review of administrative action. *Helgeson v. Bureau of Indian Affs.*, 153 F.3d 1000, 1003 (9th Cir. 1998) (citations omitted). The presumption may be overcome where there exists clear and convincing evidence of Congress's contrary intent, or where Congress drafts statutes in such broad terms that no law applies in a given case. *Id.* An agency's prior interpretation of the law in question does not bind a court, even where a statute delegates discretionary authority to an agency. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). The reviewing court still must interpret the statute independently and "effectuate the will of Congress subject to constitutional limits." *Id.*

The Court finds no contrary intent on the part of Congress to overcome the presumption of review where FBIC has alleged sufficient grounds to adjudicate a breach of trust claim. A court may infer a cause of action from a fiduciary

relationship where a plaintiff identifies specific trust duties in a statute, regulation, or treaty. *El Paso Natural Gas Co. v. United States*, 750 F.3d 863, 892 (D.C. 2014). This analysis overlaps with the APA's requirement that a plaintiff must allege that an agency failed to take a *discrete* agency action that it is *required to take*. *Id.; See Norton v. S. Utah Wilderness Alliance*, 452 U.S. 55, 64 (2004).

The Court already has found that FBIC sufficiently alleged that Defendants have a trust obligation to establish the Terms and Conditions for the allocation of the Milk River between Blackfeet and FBIC. FBIC has the "same burden to demonstrate a specific fiduciary duty in a treaty, statute, or regulation, and plausibly allege that the United States breached that duty" in its APA claim. (Doc. 68 at 9.) FBIC already has met that burden. The Court finds that FBIC sufficiently has alleged a trust obligation to sustain FBIC's APA claim beyond a motion to dismiss.

**II. Whether Blackfeet is a Required Party That Must Be Joined.**

The Court now turns to Blackfeet's motion. (Doc. 55.) Blackfeet contends that it qualifies as a required party with a legally protected interest in FBIC’s action. (Doc. 56 at 9.) Blackfeet contends that it did not waive its sovereign immunity by intervening in FBIC’s action. Blackfeet argues that the action must be dismissed if it were not a party due to its legally protected interest in the matter. (*Id*. at 10.) FBIC counters that Blackfeet possesses no legally protected interest in the controversy, because Defendants' Terms and Conditions created no ongoing procedural right to

the allocation of the Milk River. (Doc. 66 at 14.)

**A. Required Party.**

The Court underwent much of the analysis necessary to determine that Blackfeet qualifies a required party under Federal Rule of Civil Procedure 19(a) in granting Blackfeet's motion to intervene. (*See* Doc. 37). Rule 19 requires a court to first determine whether an absent party is a required party, then whether joinder is feasible, and finally whether the case can fairly proceed in the party's absence. *Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 996 (9th Cir. 2020).

A party is required and must be joined under Rule 19 in the following circumstances:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> > (i) as a practical matter impair or impede the person's ability to protect the interest; or
> > (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

The Court first considers whether Blackfeet has a legally protected interest. An absent party typically has no legally protected interest at stake in a suit that seeks only to enforce compliance with administrative procedures. *Dine Citizens*

*Against Ruining Our Env't v. Bureau of Indian Affs*., 932 F.3d 843, 852 (9th Cir. 2019), cert. denied, 591 U.S. 1016 (2020). The absent party may have a legally protected interest at stake in procedural claims where the effect of a plaintiff's successful suit would be to impair a right already granted. *Id.*

FBIC argues that Blackfeet has no legally protected interest in this litigation by drawing comparisons to *Makah Indian Tribe v. Verity*, 910 F.2d 555, 556 (9th Cir. 1990). (Doc. 66 at 15-16.) *Makah* concerned the historic treaty fishing grounds of the Makah Indian Tribe. *Makah*, 910 F.2d at 556. The Makah Indian Tribe challenged the most recent Columbia River Fish Management Plan, which set minimum "escapement" levels for all Columbia River salmon runs with quotas low enough to protect the weakest runs. *Id.* at 557. The Pacific Fish Management Council, which developed the regional fishery management plan, adopted quotas that assigned most of the allowable catch of the weakest run to river fishermen. *Id.* The plan became final after the notice and comment period. *Id.*

The Makah Indian Tribe challenged on two grounds. *Id.* The Makah Indian Tribe first alleged a treaty rights violation and requested a higher quota for the 1987 season. *Id.* The Makah Indian Tribe next brought an APA claim asserting that the regulations violated the Fishery Conservation and Management Act of 1976 (FCMA), Pub. L. 94-265, 90 Stat. 331. *Id. Makah* determined that the first claim could not proceed without the twenty-three other tribes who shared an interest in

the reallocation of the salmon harvest for 1987. *Id.* at 559.

FBIC's argument seeks to find purchase in *Makah*'s determination that the second claim could proceed. *Id.* The APA permits "any person adversely affected by agency action [to] seek review." *Id.* at 559 (quoting *Arizona Power Pooling Ass'n v. Morton*, 527 F.2d 721, 727 (9th Cir. 1975). *Makah* found it unnecessary to join the additional twenty-three tribes to adjudicate procedural claims that would affect only the future conduct of the administrative process. 910 F.2d at 559. FBIC alleges that its claims would vacate the Terms and Conditions but would impact only the future conduct of the administrative process when the Secretary of Interior promulgates new regulations. (Doc. 66 at 17.)

The Court fails to understand how vacating and ordering the Secretary of Interior to modify the Terms and Conditions would impact only future conduct. The present Terms and Conditions regulate Blackfeet's interest in water rights, regardless of whether FBIC believes them to do so adequately. An order requiring modification undoubtedly would implicate Blackfeet's already granted interests, whatever they may be. *Makah* instructed that tribes may have an interest when a suit affects inter-tribal allocation. 910 F.2d at 559. Blackfeet's interest in the Milk River originates in its own *Winters* rights and the priority date Blackfeet shares with FBIC. The Terms and Conditions, at the very least, purport to allocate uses of the Milk River between FBIC’s and Blackfeet’s exercise of their Milk River water

rights. (Doc. 50-1 at 6.) The Terms and Conditions became effective immediately on their publication and have governed those rights since they went into effect on December 19, 2024. (*Id.* at 9.) The Court finds that Blackfeet has an interest in a suit adjudicating the governance of its Milk River water right, and that interest remains legally protected.

The Court next must determine whether FBIC's suit would impair or impede Blackfeet's legally protected interest. *Makah*, 910 F.2d at 558. FBIC contends that Blackfeet's ability to protect its interests would not be impaired in disposing of this action, because there are two possible outcomes wherein Blackfeet's interests continue to be represented. (Doc. 66 at 19). First, the Terms and Conditions could be upheld, which would enable Blackfeet to continue its historical and current uses. (*Id*.) Blackfeet also would be represented if the Court were to determine that the Terms and Conditions violate the law and order a new round of consultations. (*Id*.) Blackfeet could defend any particularized legally protected interest in that consultation. (*Id*.)

The Court remains wary of excluding a tribe with an interest in water rights at stake, simply because the tribe may be able to consult on the matter at some indeterminant later date. The required party analysis proves "practical" and "fact-specific." *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990)). No "precise formula" exists for determining whether joinder of a non-party is necessary.

*Bakia v. Los Angeles Cnty.*, 687 F.2d 299, 301 (9th Cir. 1982) (per curiam). The Court cannot ignore the fact that Blackfeet continues to hold an equal interest in the Milk River water rights being adjudicated. Those rights may change substantially because of this litigation, even if Blackfeet is consulted after the fact. Blackfeet may have to take further action to defend or renegotiate the substance of those rights. The Court finds that the facts and circumstances of this litigation require Blackfeet as a party.

Finally, the Court reiterates from its order granting Blackfeet the right to intervene that Defendants cannot represent adequately Blackfeet's interests in this matter. (Doc. 36 at 14-18.) Defendants owe conflicting obligations to FBIC and Blackfeet and cannot show preference to Blackfeet’s or FBIC's interests in the litigation. *See e.g.*, *Confederated Tribes of Chehalis Indian Reservation*, 96 F.3d at 340. Further, Defendants may have similar hopes for the outcomes of this litigation, but those hopes do not necessarily reflect the sovereign interests of Blackfeet. Defendants’ “interests in this litigation begin and end with” defending the Terms and Conditions, and the tribal interests at stake "implicate sovereign interests in self-governance." *Maverick Gaming LLC v. United States*, 123 F.4th 960, 975 (9th Cir. 2024) (*quoting Deschutes River All. v. Portland Gen. Elec. Co*., 1 F.4th 1153, 1163 (9th Cir. 2021)).

Defendants concede that *Dine Citizens Against Ruining Our Environment v. Bureau of Indian Affairs*, 932 F.3d 843 (2019), represents controlling authority on

this point and the Court agrees. (Doc. 60 at 4.) *Dine Citizens* considered a motion to dismiss filed by a corporation wholly owned by Navajo Nation. 932 F.3d at 847. The tribally owned corporation had intervened in a suit brought by plaintiffs alleging that a variety of agency actions to reauthorize coal mining on lands reserved to the Navajo Nation violated the Endangered Species Act ("ESA"),16 U.S.C. § 1531 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*. *Id.* at 847.

*Dine Citizens* determined that the tribal corporation had a legally protected interest in the subject matter, because the suit could impair the tribal corporation's interest in the mining approvals. *Id.* at 853. *Dine Citizens* further determined that the federal defendants could not adequately represent the interests of Navajo Nation. The interest of the federal defendants in complying with the ESA and NEPA could override their interest in defending Navajo Nation. *Id.* at 855. The Court finds more conflicting interests here, where Defendants' interests lie in complying with the APA and in fulfilling any necessary duties to Blackfeet and FBIC.

FBIC's citation to *Erwine v. Westbrook*, No. 25-3136, 2026 WL 2674513, *13-14 (9th Cir. Sept. 11, 2026), further convinces the Court that Blackfeet's interest is legally protected. (Doc. 71.) *Westbrook* determined that a tribe was not a required party in a money damages suit against tribal officers in their individual capacities.

*Westbrook*, at *14. *Westbrook* intentionally distinguished itself from other cases involving tribal property interests wherein the relevant tribes were found to be required parties, because the suit did not challenge any tribal contract, policy, or sovereign act. *Id.* Blackfeet's interest is intertwined with the *Winters* rights reserved for Blackfeet at its priority date, as well as the negotiated interests it retained through the Settlement Act and the ensuing promulgation of the Terms and Conditions under the Settlement Act. These interests prove impossible to disentangle from Blackfeet's sovereign actions and territorial property rights. *Westbrook* reaffirms that an Indian tribe remains a required party to an action that seeks to vacate, invalidate, or otherwise alter its property interests. *Id.* (*citing Welsh v. Loudbear*, 178 F.4th 484, 490 (9th Cir. 2026)).

**B. Joinder.**

The Court turns last to the question of whether Blackfeet can be joined to this suit or whether the suit must be dismissed. Blackfeet contends that it has not waived its sovereign immunity. (Doc. 56 at 9.) Indian tribes are "distinct, independent political communities, retaining their original natural rights" in matters of local self-government. *Worcester* v. *Georgia*, 6 Pet. 515, 559 (1832). Indian tribes long have been recognized as possessing common-law sovereign immunity. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978). Any waiver of sovereign immunity should be expressed unequivocally, although a waiver of sovereign immunity can be

authorized by Congress. *Id.* (citations omitted). A "wall of circuit authority" requires dismissal when an Indian tribe cannot be joined due to its assertion of tribal sovereign immunity. *Klamath Irrigation Dist.*, 48 F.4th at 947; *Maverick Gaming*, 123 F.4th at 971.

The Court finds that Blackfeet has not waived its sovereign immunity through its limited intervention. A tribe voluntarily may participate in litigation for some limited purpose without exercising a "blanket waiver" of immunity from suit. *Maverick Gaming*, 123 F.4th at 978; *See Dine Citizens*, 932 F.3d at 857-61. Blackfeet's sole participation in this litigation has been its limited motion to intervene (Doc. 37.) and its motion to dismiss (Doc. 55.) without argument on the merits. The Court also finds compelling that Blackfeet and its Tribal Chairman have not authorized Blackfeet's counsel to waive tribal sovereign immunity. (Doc. 69 at 13; Doc. 23-1.) Blackfeet has made the limited nature of its intervention known since its motion to intervene and the Court does not find that it has strayed from that objective. (Doc. 22.)

The Court does not find that Blackfeet remains entirely immune from FBIC's suit. The Court finds that the Settlement Act waived Blackfeet's sovereign immunity for the purposes of this matter. Courts do not find abrogation of tribal sovereign immunity unless Congress has conveyed its intent to abrogate in unequivocal terms. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S.

382, 385 (2023). Tribal sovereign immunity represents the "baseline position." *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 790 (2014). A "high bar" must be met when determining whether Congress intended to abrogate tribal sovereign immunity. *Lac du Flambeau*, 599 U.S. at 385. No "magic-words requirement" exists and Congress need not state its intent in any particular way or make the statement in a singular statutory section. *Id.* at 388 (citations omitted). Courts apply traditional tools of statutory interpretation to determine whether a court clearly may discern Congressional intent from the language of the statute. *Id.*

The Court agrees with FBIC's assertion that the "structure and operation of Subtitle G of the Settlement Act, and particularly Section 3705" anticipate and authorize judicial review. (Doc. 66 at 22.) Blackfeet responds that the Settlement Act does not explicitly mention FBIC's and Blackfeet's sovereign immunity, Congress may not waive tribal sovereign immunity by implication, and that the Settlement Act did not waive its affirmative defenses even if judicial review is possible. (Doc. 69 at 18.) The Court finds that the authorization in the Settlement Act is not implied, but a component of the structure of the Settlement Act necessary for either FBIC or Blackfeet to be able to vindicate any future water rights under the Terms and Conditions.

The Settlement Act contains several important and unique features that bear upon the Court's understanding of its construction. The Settlement Act was not

drafted by Congress alone, but in negotiation with Blackfeet and the State of Montana. (Doc. 38 at 15). The final document represents Congress's ratification of the intentions of all three negotiating parties. The Court is counseled to read the statute through the lens that "'every clause and word'" has meaning. *See United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883)); *League of California Cities v. Fed. Commc'ns Comm'n*, 118 F.4th 995, 1019 (9th Cir. 2024).

The Settlement Act requires FBIC and Blackfeet to reach an agreement regarding their exercise of their Milk River water rights. Settlement Act § 3075(c), 130 Stat. at 1818. The Settlement Act directs the Secretary of Interior to promulgate the Terms and Conditions only if FBIC and Blackfeet cannot reach their own agreement. *Id.* § 3705(e)(1), 130 Stat. at 1818. The Settlement Act provides that the Terms and Conditions represent final agency action *for the purposes of review* and that *any action for review* must be brought within one year. *Id.* § 3705(e)(2)-(3), 130 Stat. at 1818 (emphasis added).

The Court fails to find a reason why Blackfeet, the State of Montana, and Congress would agree to include a provision in the Settlement Act that was not anticipated to be relevant, because both FBIC and Blackfeet have sovereign immunity. The Court finds it more plausible that the parties drafted the Settlement Act with the anticipation that FBIC and Blackfeet have an interest in vindicating

rights under Terms and Conditions that they themselves may not draft. The statute further reflects that possibility by facilitating APA review. *Id.* § 3705(e)(2)-(3), 130 Stat. at 1818. The Court is obligated to acknowledge this evidence of Congress's intention and cannot dismiss it as unnecessary. *Polansky*, 599 U.S. at 432.

FBIC's and Blackfeet's status as sovereign nations further cements the Court's understanding of purposes of these provisions, particularly when Blackfeet participated in the negotiations. The Court struggles to believe that Blackfeet would have negotiated to be subject to Terms and Conditions drafted by Defendants, if FBIC unilaterally could overrule Blackfeet's ability to challenge Defendants' breaches under those Terms and Conditions. The Court's analysis does not change simply because FBIC was the party to ultimately bring suit. The Court has little recourse but to conclude that the Settlement Act's negotiators intended for judicial review, and Congress ratified that agreement accordingly. The Court finds it unnecessary to address Rule 19(b) equity and good conscience factors based on its finding that Blackfeet must be joined as a necessary party.

**IT IS ORDERED:**

- The Department of the Interior's motion to dismiss (Doc. 53) is

**DENIED**.

- Blackfeet's motion to dismiss (Doc. 55) is **DENIED**.
- Blackfeet is **JOINED** as a required party to this litigation.

DATED this 22nd day of October, 2026.

Brian Morris, Chief District Judge
United States District Court